IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 3, 2016


**IN RE MALAYA B., ET AL.**


**Appeal from the Juvenile Court for Knox County**
**No. 56196    Timothy E. Irwin, Judge**

_____


**No. E2015-01880-COA-R3-PT**
**FILED-MAY 24, 2016**

_____


This appeal arises from the termination of Mother's parental rights. Mother's two children were removed from Mother on an emergency basis. A court later adjudicated the children dependent and neglected based on the stipulation of Mother. After the children had been in State custody for nearly eight months, the Department of Children's Services petitioned to terminate Mother's parental rights. Following a trial, the juvenile court found that two statutory grounds existed to terminate Mother's rights—substantial noncompliance with the permanency plan and persistent conditions. The court also concluded that the termination of Mother's parental rights was in the children's best interest. Mother appeals, arguing that the evidence was not clear and convincing that there were statutory grounds for termination or that termination was in the children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and BRANDON O. GIBSON, JJ., joined.

Ben H. Houston II, Knoxville, Tennessee, for the appellant, Jasmine C.B.

Herbert H. Slatery III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTS AND PROCEDURAL BACKGROUND

On May 28, 2015, the Tennessee Department of Children's Services ("DCS") received a referral that Jasmine C.B. ("Mother") was using drugs and not providing appropriate supervision for her two children, Malaya B., born November 2013, and Kymani B., born August 2011. Initially unable to locate the children, DCS later learned that Malaya had been placed with a caretaker, who had taken Malaya to a hospital in Johnson City, Tennessee, on July 7, 2014. The hospital administered a urine drug screen, and Malaya tested positive for opiates. DCS found Kymani in Knox County in the care of the mother of Mother's girlfriend. When Mother was located, she also tested positive for opiates.

The Juvenile Court of Knox County, Tennessee, awarded DCS temporary custody of the children on July 9. On July 10, DCS petitioned for a finding that the children were dependent and neglected. At a hearing held the following day, Mother waived the preliminary hearing, and the juvenile court ordered the children to remain in the custody of DCS pending an adjudicatory hearing. The court permitted Mother to have supervised visitation but also ordered that Mother complete an alcohol and drug assessment and a mental health assessment. Mother was also subject to random drug screens.

On August 4, 2014, Mother agreed to a family permanency plan, which had as its goal returning the children to Mother or placing the children with a relative. The plan identified several objectives for Mother, including becoming drug free and not abusing alcohol, finding safe and stable housing, obeying the law, and obtaining a legal source of income. The objectives relating to obeying the law and obtaining legal income stemmed from Mother's arrest for prostitution a few days earlier. To accomplish her objectives, Mother was, among other things, required to complete an alcohol and drug assessment, follow resulting recommendations, and pass random drug screens. Mother was also required to complete a mental health assessment, follow resulting recommendations, and take any medication prescribed.

By the time she agreed to the permanency plan, Mother realized she needed help. DCS referred her to an intensive outpatient program at Helen Ross McNabb Center. Mother completed intake for the program in September, and at a child and family team meeting on November 14, 2014, Mother reported that she was in the program but wanted to leave to try other treatment. In actuality, Mother had only attended two or three sessions, the last one on September 17, 2014.

When her case manager learned that Mother was not in treatment, DCS referred Mother to Health Connect America. Mother did not go. The case manager then took Mother to Susannah's House, which provides an intensive outpatient alcohol and drug treatment program for mothers. DCS also supplied Mother with bus passes so that she could travel to Susannah's House on her own. However, Mother only went to a few appointments.

The juvenile court held an adjudicatory hearing on the petition for dependency and neglect on November 24, 2014. At the hearing, Mother stipulated that her children were dependent and neglected based upon her "substance abuse issues and mental health issues for which she is in treatment, lack of stable housing, and unresolved criminal matters." At an earlier review hearing, the court noted that Mother had been arrested twice since the children had entered foster care.

After the adjudicatory hearing and the Thanksgiving holiday, DCS arranged for Mother to go to Serenity Centers of Tennessee, which provides detoxification, as well as residential and outpatient substance abuse treatment services. Mother went to Serenity on December 6, and was enrolled in the program although she reported that she was pregnant. She left the program midday on December 9, 2014. Although Serenity was willing to take her back and she agreed to come back, Mother never returned.

Undaunted by Mother's earlier failures to seek treatment, DCS made plans for Mother to have inpatient treatment at Buffalo Valley, Inc., but Mother was required to call Buffalo Valley first. She did not call. DCS also arranged for Mother to get inpatient treatment at The New Leaf Recovery Center in Cookeville, Tennessee, and her family service worker offered to drive her. However, Mother did not go.

On March 2, 2015, DCS filed a petition to terminate Mother's parental rights. The juvenile court held a hearing on the petition on September 3, 2015, at which the DCS case manager, a representative of the foster care agency, the foster mother, and Mother testified. In her testimony, Mother stated that, after the petition to terminate was filed, she began receiving inpatient treatment at Bradford Health Services in Madison, Alabama. She completed the program on April 21, 2015, but she quickly relapsed and found herself charged with theft and public intoxication. The new charges violated her probation, which stemmed from her prior prostitution conviction, so Mother spent thirty days in jail.

Mother was released from jail in late May. In June, Mother returned to Bradford, but fearing Mother was depressed, Mother's doctor referred her to Health Connect. Mother scheduled an appointment, but when Health Connect had to reschedule the appointment, Mother decided to return to Bradford because of the impending court date on the petition to terminate and she knew she "was running out of time." Ultimately, Mother completed a partial day program at Bradford, which she attended from August 3

3

to August 11, 2015. On August 12, 2015, Mother transitioned to intensive outpatient treatment and was still in the program as of the hearing date, having completed eleven out of thirteen sessions. Mother also testified that she had been sober for nearly fifty days as of the date of the hearing and that she was receiving monthly Vivitrol injections for her opioid dependence.

After hearing the proof, the juvenile court found clear and convincing evidence of substantial noncompliance with the conditions of the permanency plan and that the conditions that led to the children's removal still persist and that other conditions persisted that could cause the children to be subjected to further abuse and neglect.[1] The court also found clear and convincing evidence that termination of Mother's parental rights was in the children's best interest.

## II. ANALYSIS

Termination of parental rights is one of the most important decisions courts make. As noted by the United States Supreme Court, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1) (Supp. 2015).

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putman v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While fundamental, parental rights are not absolute. The State may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010).

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutory ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing

---

[1] After the close of proof, DCS abandoned its claim that Mother abandoned the children by willfully failing to support them. *See* Tenn. Code Ann. §§ 36-1-113(g)(1), -102(1)(A)(i).

4

evidence the existence of a statutory ground for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved. *See Santosky*, 455 U.S. at 769. The heightened burden serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.2d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* at 596 (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Appellate courts review the trial court's findings of fact in termination proceedings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. In termination proceedings, "the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993). We "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *petition for cert. filed sub. nom*, *Vanessa G. v. Tenn. Dep't of Children's Servs.*, No. 15-1317 (filed Apr. 22, 2016).

On appeal, Mother raises three issues. Her first two issues relate to the grounds for termination. She argues that DCS did not prove by clear and convincing evidence either substantial noncompliance with the conditions of the permanency plan or persistent conditions. Her final argument is that DCS did not prove by clear and convincing evidence that termination of her parental rights was in children's best interest.

A. GROUNDS FOR TERMINATION

The existence of only one statutory ground is sufficient to support a court's termination of parental rights. *In re Angela E.*, 303 S.W.3d at 251. In this case, the juvenile court relied on two grounds, and Mother challenges both. We address Mother's arguments in the context of each ground found by the court.

5

Tennessee Code Annotated § 36-1-113(g)(2) authorizes the termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether the parent complied with the permanency plan, the trial court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine,* 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)). If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. Substantial noncompliance is a question of law subject to de novo review. *Id.* at 548. Mere noncompliance is not enough to terminate a parent's rights. *Id.* Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.,* 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine,* 79 S.W.3d at 548).

Improvements in compliance are construed in favor of the parent. *In re Valentine,* 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece,* 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where "return to parent is the goal," parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

*In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

As an initial matter, Mother argues that the trial court failed to make an explicit finding that the requirements of the permanency plan were reasonable or that the requirements were related to remedying the conditions that led to the children's removal. We respectfully disagree. In its order, the court found that Mother had "failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement." Prior to making this finding, the court made findings with respect to each requirement it deemed both reasonable and related to the conditions that led to the children's removal.

Mother next argues that she in fact substantially complied with the requirements of the permanency plan. Pointing to requirements that she address her substance abuse and

6

mental health issues, Mother claims she had adequately addressed those issues by the time of trial. She also asks us to consider the time required to treat drug addiction.

We have recognized that sometimes a parent's efforts to comply with a permanency plan can be "too little, too late." *See In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003). We find that is the situation here. Mother seemed to only pursue treatment once the petition to terminate her parental rights was filed. Certainly, parents with drug addictions can "have false starts and set backs, as well as successes and, regrettably, backsliding," and we should take that into account. *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *11 (Tenn. Ct. App. Apr. 14, 2005). Yet, the proof showed that Mother made no real start to recovery from her addiction until well after she agreed to the permanency plan. The proof also showed no efforts by Mother to address her acknowledged mental health issues until after the petition to terminate was filed.

We conclude that Mother did not substantially comply with the permanency plan, and we find the evidence to be clear and convincing on that ground. Although Mother argues that there were other requirements of the plan where DCS failed to offer clear and convincing proof of noncompliance, the evidence was clear and convincing that Mother failed to meet the requirements related to her substance abuse and mental health issues, and under these facts, her failure to meet those requirements qualified as substantial noncompliance.

In addition to substantial noncompliance with the permanency plan, the juvenile court also relied on a ground for termination of parental rights commonly known as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. Under Tennessee Code Annotated § 36-1-113(g)(3), parental rights may be terminated where:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or a guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

7

Tenn. Code Ann. § 36-1-113(g)(3). The goal of the persistence of conditions ground is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate her ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

The trial court found that the children had been removed from Mother for at least six months, and Mother does not contest that finding. Instead Mother argues that she has either remedied the conditions that lead to her children's removal by the time of trial or, to the extent she had not remedied the conditions, the conditions could be remedied at an early date.

We conclude that the conditions that led to the children's removal still persist and will, in all reasonable probability, prevent the children's safe return to Mother. The children were removed from Mother because of her substance abuse and mental health issues. By the time of trial, by her own admission, Mother had been sober only fifty days. She had most recently relapsed by using marijuana. Mother was still taking injections to curb her addiction to opioids. Mother also acknowledged her depression and bipolar disorder diagnoses but admitted to not taking her medications for those problems. She testified that she was doing "great" without them. These serious issues prevent the children's safe return to Mother's custody.

We also conclude there was little likelihood that Mother could remedy her substance abuse and mental health issues or other conditions that could cause the children to be subjected to further abuse or neglect in the near future. Mother had made strides by finally seeking treatment for her addictions, but even so, Mother relapsed in late April 2015 by taking benzodiazepines, a drug unaffected by the Vivitrol she was taking for her opioid addiction. She relapsed again in late July 2015 by using marijuana. Mother, who was only 23 years old as of the hearing date, had been using drugs since the age of 18. The longest period of time she had been sober was when she was pregnant with Kymani; Mother used opiates every other day while she was pregnant with Malaya. Although we hope Mother's current efforts to stay sober are successful, the evidence indicates Mother's recovery will take time.

Mother argues that her mental health issues have been addressed through the drug treatment program at Bradford. However, Mother never completed her mental health assessment, and Mother unilaterally decided to stop taking her medication. When asked

why, Mother testified that she was "trying to see if I can at least make it without them." Even if she could make it without the medications, Mother faced other challenges.

Mother lacked a home of her own, and she did not have a stable source of legal income as of the date of the hearing. Mother had a difficult time finding housing because of her prior prostitution charge and, therefore, moved from place to place. Just before the hearing, Mother arranged to move in with her cousin, but she was only permitted to stay there as long as she stayed sober. Since being released from jail in May 2015, Mother has only worked four days, not including the occasional house cleaning job. Mother testified that she was starting a new job the day after the hearing, but evidence showed that her telephone number was still associated with an online advertisement for escort services.

Finally, the continuation of a parent-child relationship between Mother and her children will greatly diminish the chances of an early integration into a permanent home. Although she may finally be on the correct path toward dealing with her addiction, Mother still has other issues that will take time to resolve, if she is able to resolve them at all. Meanwhile, the children are doing well in their foster home, and the foster parents are prospective adoptive parents. Under these circumstances, terminating Mother's rights will clearly give the children the best chance of an early integration into a safe, stable, and permanent home.

Because each of the elements of Tennessee Code Annotated § 36-1-113(g)(3) were established by clear and convincing evidence, the trial court did not err in concluding that termination of parental rights was also justified on the ground of persistence of conditions.

## B. BEST INTEREST OF THE CHILDREN

The focus of the best interest analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In evaluating whether termination of parental rights is in a child's best interest, courts consider a list of non-exclusive statutory factors. Tenn. Code Ann. § 36-1-113(i). Not every factor enumerated in the statute applies to every case because the facts of each case can vary widely. *See In re Audrey S.*, 182 S.W.3d at 878.

In determining that termination was in the children's best interest, the trial court relied on several of the statutory factors. The court found that Mother had "not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home." Although noting that Mother had begun to address her addiction, the court reasoned that there was "no way to determine at this point whether her adjustment will be lasting." Mother had not maintained regular visitation

9

with her children, but the court acknowledged that, since the petition to terminate had been filed, she had spent time in treatment and in jail. The court also found that a change in caretakers and physical environment would "have a detrimental effect on the children's emotional and psychological condition."

The court emphasized Mother's abuse of one child and the lack of a healthy and safe environment for the children. Mother admitted that she had taken opiates while pregnant with Malaya, which the court referred to as "severe abuse." Although conceding that the residence of Mother's cousin might be completely appropriate, the court found that the children could not count on the residence being available, especially given that Mother had used illegal drugs within the last two months.

Finally, the court found Mother's mental and/or emotional status would be detrimental to the children. In this regard, the order provides "[t]he Court is leery of anybody who just quits prescribed psychotropic medication without professional supervision."

After a review of the record on appeal, we find that there was clear and convincing evidence that termination of Mother's parental rights is in the children's best interest. Like the juvenile court, we recognize the evidence showing that Mother and the children do have a relationship. However, the existence of a relationship does not outweigh the other factors favoring termination of the parent-child relationship.

## III. CONCLUSION

We conclude that there is clear and convincing evidence of the statutory grounds relied upon by the juvenile court to terminate Mother's parental rights. We also conclude that there is clear and convincing evidence that termination is in the best interest of the children. Therefore, we affirm the judgment of the juvenile court.

_____
W. NEAL MCBRAYER, JUDGE